[696 NYS2d 133]

DIVERSIFIED GROUP INCORPORATED et al., Respondents, v MITCH-
ELL E. SAHN et al., Appellants, et al., Defendants.

First Department, October 5, 1999

---

---

### APPEARANCES OF COUNSEL

*Harold I. Elman* of counsel, New York City (*William B. Wachtel* on the brief; *Wachtel & Masyr, L. L. P.,* attorneys), for respondents.

*Jeffrey G. Stark* of counsel, Mineola (*Kenneth L. Gartner* on the brief; *Meyer, Suozzi, English & Klein, P. C.,* attorneys), for appellants.

### OPINION OF THE COURT

SAXE, J.

This appeal requires us to address the question of what conduct constitutes ticket scalping.

The underlying dispute concerns three groups of season tickets to Rangers and Knicks games at Madison Square Garden. For many years, defendant Coleman & Co. (Coleman) held subscription rights to all three groups of season tickets. These subscription rights were explicitly nontransferable under Madison Square Garden (MSG) regulations, and were subject to cancellation by MSG. Nevertheless, in March 1997 Coleman entered into an agreement with defendant Mitchell Sahn transferring to Sahn all subscription rights to these three subscriptions; under this agreement Sahn paid Coleman $90,000 above the face value of the tickets. The contract also prohibited Sahn from selling the tickets without the prior approval of Coleman. In accordance with another term of the contract, providing that Coleman would "use its best efforts" to arrange for future notices regarding the subscriptions to be sent to Sahn's address, on July 22, 1997, Coleman sent MSG a letter notifying it of a change in the address and contact person for the subscriptions, and giving it instead Sahn's address, and his name as Coleman's "contact person".

On July 22, 1997, Sahn entered into a contract with plaintiff James Haber under which Haber purchased the subscription rights to a portion of the tickets, paying $140,000 above the price of the tickets. This contract, like Sahn's contract with Coleman, acknowledged that transfer of ownership or subscription rights was prohibited. It further provided that if MSG canceled the subscription or tickets, "then Haber shall have no further rights against Sahn and Sahn shall have no further

obligation pursuant to this agreement." A separate letter agreement dated July 23, 1997 set out a breakdown of the contract price, dividing the total into two categories, $52,350 for the price of the tickets, and $140,000 as payment for the "[t]ransfer of [r]ights".

Before Haber could obtain or use the subject tickets, however, on August 27, 1997, MSG canceled the Coleman subscriptions, and refunded the price of the tickets themselves to Coleman, from which refund Haber was ultimately repaid for the face value of the tickets he had contracted to purchase. However, Sahn retained the $140,000 Haber had paid to him above and beyond the price of the tickets.

This action ensued, in which plaintiffs sought rescission of the contract and the refund of the $140,000, alleging as grounds for rescission failure of consideration, frustration of purpose, and violation of the anti-scalping provisions of Arts and Cultural Affairs Law article 25. On cross motions for summary judgment, the motion court agreed with plaintiffs' contention that the contract was illegal, and awarded judgment against Sahn and his wife Karen Sahn (who had been the named payee on one of Haber's payment checks, for part of the contract price).

We agree that the contract between Haber and Sahn was, in reality, an agreement to resell the tickets in violation of the so-called "anti-scalping law" (Arts and Cultural Affairs Law § 25.01 *et seq.*).

A primary goal of article 25 of the Arts and Cultural Affairs Law is "deterring ticket speculation which costs New York and visiting theater and concert goers, as well as sports fans, countless dollars in increased ticket prices or causes them simply not to attend these events" (Block, Practice Commentaries, McKinney's Cons Laws of NY, Book 3B, Arts and Cultural Affairs Law, ch 11-C, tit G, 1999 Pocket Part, at 129). The Legislature has stated a public policy of protecting against the sale at exorbitant prices of tickets being resold by unscrupulous promoters and others who make enormous profits on ticket resales (*see,* Mem of State Consumer Protection Bd in Support of L 1991, ch 704, 1991 McKinney's Session Laws of NY, at 2100-2101).

It is in order to combat such resales of tickets at exorbitant prices that Arts and Cultural Affairs Law §§ 25.07 (2) and 25.13 make it illegal both to resell tickets without a license to do so, and to resell tickets at above the "maximum premium price", defined as "the established price plus five dollars or ten percent

of the established price, whichever is greater" (Arts and Cultural Affairs Law § 25.03 [4]).

Defendants take the position that no scalping occurred because the transaction involved two distinct salable items: the tickets themselves, sold for their face value, and the subscription rights, for which Haber paid the additional sum of $140,000. They emphasize that the terms of the contract framed the transaction this way, and argue that what was being purchased was far more than the tickets themselves, which by definition are merely a right of entry to particular games (*see*, Arts and Cultural Affairs Law § 25.03 [10]).

Defendants focus too much on the phrasing of the contract, and too little on its manifest intention. It is the responsibility of the court, on a motion for summary judgment, to determine the parties' intent, if possible, from within the four corners of the document (*see*, *International Mar. Investors & Mgt. Corp. v Wirth*, 245 AD2d 544, 545). Despite their attempt to draft their contract so as to give it the appearance of a permissible transaction, Sahn's and Haber's intent in entering into the contract, namely, to arrange the resale of the subject tickets at a premium price, is apparent from a review of the contract as a whole.

The subscription rights that Sahn purported to sell to Haber break down into two parts: the right to purchase the tickets to specified seats for that year's home games, and the right to renew the subscription in following years. As to the purported sale of the "right" to purchase that season's tickets, such a sale is indistinguishable from a resale of the subject tickets. Since the contract's right to purchase the tickets entails purchasing them, not from MSG, but from the subscriber, it amounts to simply a promise by the subscriber to resell those tickets to the contract vendee. When tickets are resold to another by a subscriber unlicensed to resell tickets, it does not matter whether the tickets are in the possession of the named subscriber before they are sold, or whether the subscriber arranges to sell them prior to actually having them in hand. Either way, the anti-scalping provisions of the Arts and Cultural Affairs Law have been violated merely by the resale. So, in that respect alone, the contract is void for illegality.

The second aspect of subscription rights, the right to renew the subscription, gives the subscriber the right (albeit a revocable one) to purchase the same seats to the home games the following year. If a right to renew the subscription the following year is transferable at the option of the subscriber, that

right might well have a value independent of the price of the tickets (*see*, *In re I.D. Craig Serv. Corp.*, 138 Bankr 490; *but see*, *In re Liebman*, 208 Bankr 38, 40 [an expectation of an offer to renew season tickets does not give rise to a property interest, so bankruptcy trustee may not sell same]; *In re Harrell*, 73 F3d 218, 219 ["the opportunity to renew season tickets is not a property right" to be sold by bankruptcy trustee]).

However, where, as here, the owner of the arena *prohibits* subscribers from transferring the right to renew, the subscriber cannot sell the status of record holder of title to the subscription (*compare*, *In re I.D. Craig Serv. Corp.*, 138 Bankr 490, *supra*). The only thing being sold, other than the tickets themselves, amounts to, at best, the subscriber's promise to similarly resell the following year's tickets to the buyer, assuming the sports forum has not canceled the subscription.

Given the strong public policy behind the anti-scalping law, the charge of $140,000 beyond the ticket price, for the promise of reselling the same seats to the purchaser in future years, is nothing but an attempt to circumvent the prohibition of the statute, and will not be sanctioned by this Court.

We reject defendants' suggestion that in determining this appeal we must take into account the purported interests of New York sports franchises. Specifically, defendants report that a major source of financing for new sports arenas involves "personal seat licenses", under which one buys a license to a lifetime seat location—while still paying separately for the season tickets for that location (citing Seattle Post-Intelligencer, June 16, 1997; San Francisco Examiner, Apr. 22, 1997, at A-6), and that this type of financing arrangement might be adversely impacted by a ruling prohibiting season ticket subscribers from selling their "subscription rights". However, we are unwilling to accept as fact defendants' representation as to the interests of sports franchises generally. More importantly, even if the defendants' assertion is accurate, to the extent those purported interests conflict with the interests protected by the anti-scalping law, they must be considered secondary to the public policy already expressed by the Arts and Cultural Affairs Law. Moreover, nothing in our holding necessarily precludes such a sale if an arena owner chooses to permit the transfer of subscription rights.

Defendants also emphasize that Haber was not an innocent victim of an illegal contract, but a willing participant with an equal role in a transaction whose nature he fully understood when he entered into it. Normally, a fact of this sort would be

relevant on the question of whether plaintiff would be entitled to relief. That is, the court could leave both parties where it found them, in view of plaintiff's equal responsibility for the illegality of the transaction (*see,* Dobbs, Remedies § 13.5, at 994-996), by application of the maxim *"in pari delicto potior est conditio defendentis"* (*id.,* at 997 ["in essence, that when the parties are in equal fault, the court should hold for the defendant"]).

However, here the statute specifically provides for a private right of action to recover actual damages (*see,* Arts and Cultural Affairs Law § 25.33). It was therefore contemplated that among those suffering actual damages would be purchasers of scalped tickets, although they could generally be assumed to have been aware of the illegality of ticket scalping when they entered into the transaction. Thus, general equitable principles regarding the plaintiff's equal culpability are overridden by the principles enunciated by the statute.

The award of attorneys' fees was authorized by the statute, and did not constitute an improvident exercise of discretion. Whether or not the Sahns' position as to the legality of the contract was "substantially justified" is irrelevant to the determination.

In one respect, however, the judgment must be modified. Nothing in the pleadings or moving papers demonstrates a right to judgment in the full sum sought as against defendant Karen Sahn, inasmuch as she was not a party to the contract, but merely the payee on one of the checks by Haber that together constituted his full payment under the contract. The judgment as against Karen Sahn is therefore reduced from $140,000 to $40,370. Of course, Mitchell Sahn's liability for the full sum paid by Haber pursuant to the terms of the contract is unaffected by the fact that he had Haber divide up his contract payment into various checks made payable to other individuals or entitites.

Accordingly, the judgment of the Supreme Court, New York County (Charles Ramos, J.), entered December 31, 1998 in favor of plaintiffs, and bringing up for review the order of the same court and Justice, entered December 9, 1998, which granted plaintiffs' cross motion for summary judgment and denied defendants' motion for summary judgment, should be modified, on the law, so as to limit plaintiffs' judgment as against defendant Karen Sahn to the sum of $40,370, and as so modified, affirmed, without costs. Appeal from the aforesaid order should be dismissed, without costs, as subsumed in the appeal from the aforesaid judgment.

SULLIVAN, J. P., ROSENBERGER, TOM and BUCKLEY, JJ., concur.

Judgment, Supreme Court, New York County, entered December 31, 1998, modified, on the law, so as to limit plaintiffs' judgment as against defendant Karen Sahn to the sum of $40,370, and as so modified, affirmed, without costs. Appeal from order, same court, entered December 9, 1998, dismissed, without costs, as subsumed in the appeal from the aforesaid judgment.